**Merina M. MACHARIA,
et al. Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**No. 99CV3274.**

United States District Court,
District of Columbia.

July 30, 2002.

Philip Michael Musolino, Musolino & Dessel, Mark Steven Zaid, Washington, DC, for Plaintiffs.

Meredith Manning, U.S. Attorney's Office, Robin M. Earnest, U.S. Attorney's Office Civil Division, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Presently pending before the Court is Defendant United States' Motion to Dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs, representing a prospective class of over five thousand Kenyan citizens and businesses, bring this action in connection with the August 7, 1998, terrorist bombing of the United States Embassy in Nairobi, Kenya (the "Embassy"). Plaintiffs allege that Defendant's negligence related to the security of the Embassy compounded Plaintiffs' injuries and losses suffered as a result of the bombing. Upon review of Defendant's motion to dismiss, memorandum of law and attached exhibits, Plaintiffs' opposition thereto, Defendant's reply, and the relevant law, the Court shall grant Defendant's motion to dismiss.

## I. BACKGROUND

On August 7, 1998, a terrorist bomb exploded at the rear entrance to the American Embassy in Nairobi, Kenya, killing over two hundred people, injuring thousands more, and damaging Kenyan businesses located near the Embassy. Plaintiffs' Amended Complaint ("Cplt.") at 68. The bombing injured those inside the Embassy compound, and led to the collapse of the adjacent Ufundi Building. *Id.* ¶ 71. Additional injuries occurred when glass windows shattered at the nearby Co-op Bank Building. *Id.* It is believed that the bombing was carried out by the *al Qaeda* terrorist organization, led by Osama bin Laden. *Id.* ¶ 69.

Plaintiffs complain that the "actions and inactions by the United States of America, principally through the Department of State, created circumstances which permitted the Bombing and subsequently caused and exacerbated the loss and injury sustained by Kenyan victims." *Id.* at 68. Specifically, Plaintiffs allege in Count One that the Embassy was inherently dangerous and that employees of the Department of State ("DOS") knew or should have known that a terrorist attack against the Embassy was likely. Cplt. ¶¶ 82–94. Despite this knowledge, Plaintiffs argue, DOS employees failed to alert their superiors, the Embassy, and Kenyan citizens that such dangers were imminent. *Id.* ¶¶ 57, 91 Additionally, Plaintiffs assert that DOS employees failed to provide sufficiently trained security personnel to the Embassy and failed to take necessary security precautions to prevent such an attack. *Id.* ¶¶ 88–89. Plaintiffs allege further that the United States "made security and rescue related decisions based on race and national origin." Cplt. ¶ 92. Plaintiffs also allege that the United States is responsible, based on the doctrine of *respondent superior*, for the negligence of the independent contractor providing security services at the Embassy. *Id.* ¶¶ 52, 75, 88. As a result of this alleged failure to provide appropriate security, Plaintiffs claim in Count Two that the Embassy was a public and private nuisance that "deprived neighbors of the use and enjoyment of their adjoining property." *Id.* ¶¶ 95–98. In Count Three, Plaintiffs maintain that the United States violated international customary law, the Kenyan Constitution, and the International Covenant on Civil and Political Rights ("ICCPR") by its alleged security failures. *Id.* ¶¶ 99–106. Plaintiffs, in Count Four, request relief in the form of a constructive trust, to hold any assets or funds seized by the United States from Osama bin Laden and *al Qaeda* for the "use, benefit, and enjoyment of the plaintiffs and prospective class members." Cplt. ¶ 109. Plaintiffs allege that this Court possesses jurisdiction over the present action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, which operates as a limited waiver of the United States' sovereign immunity. Cplt. at 68.

Defendant moves to dismiss Plaintiffs' Complaint on the grounds that it is not amenable to suit in this Court based on the foreign country exception, 28 U.S.C. § 2680(k), and discretionary function exception, 28 U.S.C. § 2680(a), to the FTCA's waiver of sovereign immunity. Defendant's Memorandum of Law ("Def.Mem.") at 14, 17. Defendant contends first that Plaintiffs have failed to demonstrate that any of the alleged negligent conduct complained of occurred within the United States. *Id.* at 14–17. Second, Defendant argues that any actions that may have taken place within the United States clearly fall within the discretionary exception to the FTCA. *Id.* at 17–30. Finally, Defendant asserts that Plaintiffs fail to state a claim predicated on international and Kenyan law and fail to state a

claim for a constructive trust. *Id.* at 2, 37–38.

## II. DISCUSSION

### A. *Legal Standard*

In reviewing a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court will not grant the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, at this early stage in the proceedings, the Court assumes the veracity of all factual allegations set forth in Plaintiff's Complaint. *See Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985). Moreover, "[t]he complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979). Nonetheless, the Court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC,* 132 F.3d 753, 762 (D.C.Cir.1997).

■■ Before a federal court may hear a case, it must ascertain whether it has jurisdiction over the underlying subject matter of the action. *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."). Motions to dismiss for lack of jurisdiction over the subject matter of the action are proper under Federal Rule of Civil Procedure 12(b)(1). In the Rule 12(b)(1) context, the plaintiff bears the burden of proving juris-

diction. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182–183, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). When a defendant brings a challenge to the actual complaint itself, without relying on matters outside the pleadings, the motion to dismiss is a "facial challenge" to a complaint, because a district court is not asked to review documents outside the pleadings. *See Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir. 1986), *vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (materials *aliunde* pleadings can be considered on Rule 12(b)(1) motion); 2 James Wm. Moore et al., *Moore's Federal Practice,* § 12.30[4], at 39 (3rd ed. 2002) ("A facial attack questions the sufficiency of the pleading."). On a motion to dismiss a case that presents such a "facial challenge," a court must accept all of the complaint's well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor. *United Trans. Union v. Gateway Western R. Co.,* 78 F.3d 1208 (7th Cir. 1996) (*citing Rueth v. EPA,* 13 F.3d 227, 229 (7th Cir.1993)).

■ However, in some instances, a court is required to look beyond the pleadings and to inquire into facts that are pertinent to the determination of whether it has subject matter jurisdiction. *Land,* 330 U.S. at 735 n. 4, 67 S.Ct. 1009. Such a "factual challenge" attacks the existence of subject matter jurisdiction by looking beyond the pleadings and places the burden on the plaintiff to prove that facts exist that establish a court's jurisdiction. *See Federal Election Com. v. National Rifle Assoc.,* 553 F.Supp. 1331, 1343 (D.D.C. 1983) ("A 'factual attack,' however, challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings,

such as testimony and affidavits, are considered. Moreover, a 'factual attack' under Rule 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist.") (internal citations omitted).

In this instance Defendant brings a factual challenge to the existence of subject matter jurisdiction and thus, Plaintiff bears the burden of presenting proof that jurisdiction properly lies with this Court.

### B. *The Federal Tort Claims Act*

■ Absent an express waiver of sovereign immunity, a plaintiff may not sue the United States in federal court. *See FDIC v. Meyer*, 510 U.S. 471, 474, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *see also United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80, creates an express limited waiver of the United States' sovereign immunity, rendering the federal government and its agencies liable for certain "tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674(a). While the FTCA creates the jurisdictional basis for tort claims brought against the United States, the underlying claims are determined according to local law.

In enacting the FTCA, Congress explicitly preserved the federal government's immunity from suit for claims "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) ("discretionary function exception"). A plaintiff must further demonstrate that the complained of act or omission by the United States does not arise in a foreign country. *See* 28 U.S.C. § 2680(k) ("foreign country exception"). If a claim falls within one of these FTCA exceptions, the Court does not possess subject matter jurisdiction and must dismiss the action.

### C. *Defendant's motion to dismiss for lack of subject-matter jurisdiction Fed.R.Civ.P. 12(b)(1).*

■ Defendant moves to dismiss Counts One and Two of Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) based on the discretionary function and the foreign country exceptions to the FTCA. At the outset, the Court must address Plaintiffs' erroneous assertion that Defendant's motion to dismiss Plaintiffs' complaint pursuant to Federal Rule of Procedure 12(b)(1) must be treated as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' Opposition to Defendant's Motion to Dismiss Complaint ("Pl.Opp'n") at 4–6. Plaintiffs contend that attacks as to jurisdiction pursuant to Rule 12(b)(1) "should be limited to complaints which establish failure to exhaust administrative remedies, or which establish that the tort upon which the complaint is based falls within one of the explicit exceptions set out in 28 U.S.C. § 2680(h)."[1] Pl. Opp'n at 4. Plaintiffs argue that where, as here, a defendant

---

1. 28 U.S.C. § 2680(h) creates an exception to the waiver of immunity for "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

moves to dismiss a claim based upon the discretionary function exception or the foreign country exception to the FTCA, courts should apply the "heightened requirements of Rule 12(b)(6)" and treat all factual allegations—including those related to jurisdiction—in the complaint as true. *Id.*

Plaintiffs' assertion has little merit. As discussed above, when a court is required to look beyond the pleadings to establish its jurisdiction, a plaintiff must through testimony and affidavits, demonstrate that a case is properly before the court. *See Land,* 330 U.S. at 735, 67 S.Ct. 1009. This Court must review the allegations in Plaintiffs' Complaint, and may review facts outside of the pleadings, in order to determine whether jurisdiction exists. In this instance, that means examining facts related to where the alleged negligent actions took place, at home or abroad, and whether Defendant's actions were in fact discretionary in nature. However, "we do so only to determine whether the district court has jurisdiction over those actions, not to prejudge the merits of the case. If the district court has jurisdiction over the suit, the plaintiff must still prove that the government's actions were negligent in order ... to prevail." *Cope v. Scott,* 45 F.3d 445, 448 (D.C.Cir.1995).

The cases cited by Plaintiffs do not indicate otherwise. Plaintiffs primarily rely on *Richardson v. United States,* 193 F.3d 545 (D.C.Cir.1999), for the contention that a motion to dismiss based on the discretionary function must satisfy the heightened requirements of Rule 12(b)(6). To the contrary, that case directly found that "no one doubts that [the plaintiff's] original complaint would properly be dismissed for

lack of subject matter jurisdiction, because of the discretionary function exception." *Richardson,* 193 F.3d at 547. The issue in *Richardson* dealt with whether the district court had erred in denying a *pro se* plaintiff a chance to amend his complaint in order to state a cognizable claim. Nowhere, does the *Richardson* court indicate that, in applying the discretionary function exception, a court is unable to dismiss a claim pursuant to Rule 12(b)(1) and in fact, recognized that such dismissal was appropriate as to the plaintiff's original complaint. *Id.*

Further, Plaintiffs contend at the outset that this Court should not dismiss the action pursuant to Rule 12(b)(1) because Plaintiffs have not had the opportunity to conduct sufficient jurisdictional discovery in this case. Pl. Opp'n at 8. Plaintiffs argue that Defendant has failed to produce certain requested documents that pertain to how the DOS identifies terrorist threats and how the DOS makes decisions regarding who to notify regarding such threats. *Id.* Without this information, Plaintiffs argue, "Defendant ... is precluded from making a factual attack on the threat reaction claims in this case." *Id.* at 8.

Plaintiffs argument is merely an attempt to re-litigate matters already resolved by this Court and the Magistrate Judge in this case. Plaintiffs were afforded three months of discovery on the jurisdictional question, during which time they had the opportunity to submit interrogatories, depose witnesses, and request documents from the Defendant. *See* December 17, 2001, Order; Civ. No. 99–3274(CKK) at 3, Plaintiffs were permitted to take Federal Rule of Civil Procedure 30(b)(6) depositions of United States personnel[2] regard-

**2.** The Court notes that Plaintiffs also had an opportunity to take five Rule 30(b)(5) depositions on the jurisdictional question in a related action before this Court, dismissed on March 30, 2002, *Bicharge v. United States,*

ing "how and where the Department made decisions concerning security, local guards, training, and management of threat information." *See* October 3, 2001, Order Civ. No. 99–3274(AK) at 6. Magistrate Judge Alan Kay denied Plaintiffs' requests for additional discovery and resolved all of Plaintiffs' challenges concerning the sufficiency of Defendant's compliance with discovery requests. *See Id.* Magistrate Judge Kay subsequently clarified his Order of October 3; explaining that Defendant was not required to "produce responses which address both jurisdictional and factual issues." October 30, 2001, Order Civ. No. 99–3274(AK) at 2. Consequently, this Court concludes that Plaintiffs have had ample opportunity to obtain information from Defendants concerning the jurisdictional issue and reiterates that "Plaintiffs are not entitled to further jurisdictional discovery." Dec. 17, 2001, Order at 3.

### 1. *Discretionary Function Exception*

■ The Court will begin its analysis with the discretionary function exception. All of Plaintiffs' claims contained in Counts One and Two, save one, related to the negligence of the independent contractor, and can be resolved pursuant to this exception.[3]

■ Pursuant to the discretionary function exception, the United States retains sovereign immunity for any acts taken by a federal employee that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a). This exception applies to governmental acts that "involve an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). The purpose of the exception "is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267 (internal citations omitted). In determining the applicability of the discretionary function exception, the Court undertakes a two part test. First, the Court must determine whether a federal statute, regulation, or policy specifically prescribes a government actor's course of action. *Id.* at 322, 111 S.Ct. 1267. In such a case, no discretion is employed and the only remaining inquiry for the Court is whether the employee did, or did not, do what was prescribed by the applicable statute, regulation or policy. *See Cope v. Scott*, 45 F.3d 445, 448 (D.C.Cir.1995). Second, if no specific action is prescribed, the act is discretionary, and the court must next determine whether the action was of the type grounded in

---

Civ. Action No. 00–1636 (D.D.C. March 30, 2002).

**3.** Plaintiffs, in recognition of the foreign country exception, have attempted to demonstrate that the injuries and property damage suffered in Kenya were the result of negligent acts or omissions committed within the United States. *See* Cplt. ¶¶ 40–62. This type of claim is known as a "headquarters" claim. *See Beattie v. United States*, 756 F.2d 91 (D.C.Cir.1984). However, headquarters claims are "recognized by this Circuit … in such limited circumstances that in general,

'unless subject matter jurisdiction can be separately established for those claims truly arising in a foreign country … it is seldom worth [plaintiffs'] while to try to make a case live or die on the basis of headquarters claims.'" *MacCaskill v. United States*, 834 F.Supp. 14, 17 (D.D.C.1993), *aff'd without opinion* 24 F.3d 1464 (D.C.Cir.1994) (quoting *Beattie*, 756 F.2d at 97). The Court for the purposes of its discussion of the discretionary function analysis will assume that Plaintiffs have properly alleged a headquarters claim.

social, economic, or political policy. *Sloan v. U.S. Dep't of Housing & Urban Dev.*, 236 F.3d 756, 761 (D.C.Cir.2001) (citing *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267). If an "established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agents' acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324–325, 111 S.Ct. 1267. Once it is established that the government actions in question are discretionary in nature and grounded in an appropriate policy, a court lacks subject matter jurisdiction over claims predicated upon that discretionary action (or inaction).

Plaintiffs contend that officials in the United States committed twenty-one negligent acts that were either non-discretionary or not subject to "policy judgment." Pl. Opp'n at 29–30. All of these allegedly negligent acts can be categorized as either: 1) a failure to provide guidance and advice on improving security at the Embassy, 2) a failure to provide security equipment to the Embassy, 3) a failure to train adequately Embassy personnel and contractors to deal with various security threats, 4) a failure to warn adequately Embassy personnel, and others, of potential terrorist threats, 5) an improper classification of the level of security risk at the Embassy, or 6) falsely leading Embassy personnel to believe that security analyses had been conducted or would be conducted. *Id.* The Court concludes that each of these alleged actions fall within the discretionary function exception to the FTCA.

### a. Mandatory vs. Discretionary Conduct

■■■ None of the actions about which Plaintiffs complain involve a failure to abide by the dictates of a statute, guideline or regulation. Although Plaintiffs repeatedly assert that DOS officials failed to fulfill "non-discretionary" duties, Pl. Opp'n 15, 22, Plaintiffs fail to identify any relevant statute, guideline, or regulation that prescribed DOS employees' course of action related to the security at the Embassy. Plaintiffs cite documents that either are not guidelines prescribing a specific course of action, or are guidelines that do not apply to Plaintiffs' specific claims. Plaintiffs' failure to identify a relevant guideline or regulation is not surprising as determinations about what security precautions to adopt at American embassies, and what security information to pass on, and to whom this information should be given, do not involve the mechanical application of set rules, but rather the constant exercise of judgment and discretion.

For instance, the United States Department of State Foreign Affairs Manual, Diplomatic Security ("FAM"), Def. Mem; Exhibit 2, instructs, in the "Physical Security Standards" section, that "[p]roject managers and regional security officers (RSO's) should follow all standards *to the maximum extent possible.*" Def. Mem; Exhibit 2, 12 FAM 314.1 (emphasis added).[4] This Manual further instructs that when full implementation of outlined standards is "impossible or inappropriate," foreign service officers should engage in a process of "[r]isk management." *Id*, 12 FAM 6 H 511.4. This risk management "process begins with an assessment of the

---

4. In *Cope,* the plaintiff cited a Park Service manual that established road safety standards "applicable only 'to the extent practicable.'" 45 F.3d at 450. In response, the Court of Appeals for the District of Columbia Circuit observed that "this caveat means that the standards are applicable only when no competing priorities exist. *Such flexibility is the essence of discretion.*" 45 F.3d at 450 (emphasis added).

value of the assets, the degree of a specific type of threat, and the extent of the vulnerabilities.... A decision is then made as to what level of risk can be accepted and which countermeasures should be applied. Such a decision involves a cost-benefit analysis, giving decision makers the ability to weigh varying security risk levels against the cost of specific countermeasures." *Id.* Thus, as this document clearly illustrates, the process of securing an embassy involves subjective analysis, decisions, and a balancing of benefits; it does not involve the mechanical application of guidelines or rules.

In addition, Plaintiffs attempt to demonstrate that certain DOS reports establish that the security measures taken prior to the 1998 attack were "inadequate," and contained "identified deficiencies." Pl. Opp'n 20–21. However, Plaintiffs arguments as to the inadequacy or deficiency of the level of security that in hindsight would have been desirable on the day of the bombing is merely an attempt to argue the merits of the case, rather than evidence that Defendant failed to comply with certain mandatory guidelines and regulations.[5] In sum, none of the actions or instances of inaction that form the basis of Plaintiffs' Complaint involve a failure to perform nondiscretionary duties. Therefore, this Court turns to the next step in the *Gaubert* analysis and must determine whether DOS employees' alleged actions and inactions implicated social, political, or economic policy considerations. *Cope,* 45 F.3d at 448–49.

### b. Political, Social, and Economic Policy Considerations

Under the FTCA discretionary function exception, not all discretionary conduct is exempted; only conduct that is "susceptible to policy judgment and involve[s] an exercise of political, social or economic judgment" is exempt. *Cope v. Scott,* 45 F.3d 445 (D.C.Cir.1995) (internal citations omitted). Decision-making based on policy considerations has been contrasted with "determinations involving the 'application of objective scientific standards;'" the latter are not protected by sovereign immunity even when they involve the exercise of discretion. *Sloan,* 236 F.3d at 765. However, when "balancing factors" is an integral part of the decision-making process, and particularly when this involves considerations such as how to "allocat[e] funds among significant project demands," and how to weigh inconvenience against "the risk of safety hazards," decisions are susceptible to policy judgment. *Cope,* 45 F.3d at 451; *see also United States v. S.A. Empresa de Viacao Aerea Rio Grandense ("Varig Airlines"),* 467 U.S. 797, 820, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (finding that decisions that require the government to "establish priorities for the accomplishments of its policy objectives by balancing the objectives sought ... against such practical considerations as staffing and funding," implicate the discretionary function exception).

Moreover, "it is the nature of the conduct, rather than the status of the actor," that governs whether the conduct is based on policy considerations. *Varig*

---

**5.** The Court must also note that Plaintiffs frequently cite to inapplicable or irrelevant guidelines in order to attempt to demonstrate that mandatory duties exist. For instance, Plaintiffs make a weak attempt to suggest the existence of "certification requirements," for bomb detection equipment. Pl. Opp'n at 20. Yet the document cited relates to the safety of X-ray devices used by embassy personnel. B. 6085. Similarly, Plaintiffs attempt to suggest that the building's windows did not meet DOS security standards. Pl. Opp'n at 21. Yet the standards cited by Plaintiffs pertain only to newly acquired or renovated embassy buildings. B. 7691, 9195. The Embassy in Nairobi was not such a building. B. 3500.

*Airlines,* 467 U.S. at 813, 104 S.Ct. 2755. Thus, the fact that security related decisions may not have been taken by high level government officials is irrelevant to the question of whether those decisions implicate economic, social or political policies. Even "day-to-day 'operational' decisions" of a federal agency often implicate policy considerations. *Gaubert,* 499 U.S. at 332, 111 S.Ct. 1267; see also *Sloan v. Dep't of Housing and Urban Development,* 236 F.3d 756, 762 (D.C.Cir.2001) ("the discretionary function exception ... does not apply 'exclusively to policymaking or planning functions,' but rather extends as well to decisions made at the operational level.").

■ The conduct at issue in this case and the decisions regarding what action to take related to security clearly are "susceptible to policy analysis" and thus the discretionary function exception is applicable. Plaintiffs attempt to argue that decisions regarding whether or not to warn Embassy employees and Kenyan citizens about a possible terrorist threat and decisions regarding "how best to secure the Embassy's premises" did not implicate political, social or economic policy considerations. Pl. Opp'n at 37–41. Plaintiffs argue that Defendant's actions related to the alleged security failures at the Embassy "could not evoke social wisdom ... political practicality ... or economic expediency ... Rather, that conduct implicates negligence ... due care ... and reasonableness, and fall well outside the confines of discretionary functions." Pl Opp'n at 40, (quoting Declaration of J. Jerome Bullock) (omissions in original). However, Plaintiffs fail to counter Defendant's specific arguments that the decisions made by DOS and its employees in relation to how best to secure the Nairobi Embassy implicated specific policy concerns.

Decisions regarding how much safety equipment should be provided to a particular embassy, how much training should be given to guards and embassy employees, and the amount of security-related guidance that should be provided necessarily entails balancing competing demands for funds and resources. Each individual embassy's need for security must be balanced against the need perceived at other embassies, and the need for security must be balanced against the need for alternative projects that could consume scarce resources. Moreover, each of Defendant's decisions regarding security involved balancing potential inconvenience to State Department employees against the perceived security gains that would result from a safety measure.

Decisions regarding when and how to warn people of potential terrorist threats similarly involve a balancing of policy considerations. DOS employees must balance the cost and inconvenience that a false warning might cause against the risk that any given threat will materialize. Where such a warning might influence the actions of officials of foreign governments—as a warning about threats to a United States embassy likely would-American officials must also consider the effect that a warning, or the failure to give one, might have on that foreign government and American relations with it. Classification of the level of risk facing an embassy involves choices about what types of threats the United States considers most worrisome. It also involves determining how much risk, and what types of risk, should be required before an embassy is eligible for certain security measures. As risk classification makes a statement about conditions in the country where the embassy is located, it could also influence United States relations with that country, and therefore be influenced by the footing on which the United States seeks to maintain those relations.

It is exactly because such political, economic and social policy considerations must be balanced that Congress granted the discretionary authority to the Secretary of State to "develop and implement ... policies and programs, including funding levels and standards, to provide for the security of the United States Government operations of a diplomatic nature and foreign government operations of the diplomatic nature in the United States." 22 U.S.C. § 4801 (1990) (Omnibus Diplomatic Security and Antiterrorism Act). As the Act allows the Secretary to exercise discretion "it must be presumed that the [Secretary's] acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324–325, 111 S.Ct. 1267. The decisions made by Defendant regarding the security of the Embassy and warnings of possible threats are clearly discretionary in nature and grounded in policy and therefore, do not fall within the FTCA's waiver of sovereign immunity.

### 2. *Foreign Country Exception*

 The FTCA also prohibits suits against the United States for acts or omissions arising in a territory subject to the sovereignty of another nation. 28 U.S.C. § 2680(k); *United States v. Spelar*, 338 U.S. 217, 219, 70 S.Ct. 10, 94 L.Ed. 3 (1949). Congress exempted actions arising in foreign countries from the FTCA because "it was unwilling to subject the United States to liabilities depending upon the laws of a foreign power." *Spelar*, 338 U.S. at 221, 70 S.Ct. 10. As noted above, while jurisdiction is determined by the FTCA, the underlying tort claims are decided based on the local law where the act or omission occurred.

The United States argues that the acts Plaintiffs complain of occurred, for all practical purposes, in Kenya, and are therefore not actionable—even if negligent—due to the foreign country exception to the FTCA's waiver of immunity. Def. Mem. at 14–15. With one exception, which the Court addresses below, this Court need not address the question of whether Plaintiffs are complaining of acts that took place in Kenya, or acts that took place in the United States because, as discussed in Part II.C.1 above, the discretionary function exemption renders the United States immune from liability for such alleged acts or omissions. However, the Court discusses below Plaintiffs' allegations regarding Defendant's liability for the acts and training of local guards as such claims are not resolved by application of the discretionary function exception.

Plaintiffs allege that the United States is responsible under the doctrine of *respondeat superior* for the negligence of local guards employed by a private contractor, United Internal Investigative Services ("UIIS"), retained to provide Embassy security. Cplt. ¶¶ 52, 75, 88. Plaintiffs contend that the local guards were not properly trained to respond to the situation that arose on August 8, 1998, and that Defendant is responsible for this failure to train and the negligent acts of the local guards. *Id.* UIIS contracted with the Embassy in Nairobi agreeing to provide local guard services for the Embassy. Def. Mem at 12, Exhibit 3 (UIIS Contract). UIIS' responsibilities under the contract included providing "basic training,[6] firearms qualifications, and annual recertification training" for the local guards. Def. Mem, Exhibit 3 at 7498. UIIS also hired managers responsible for security force training and provided security training for Embassy employees and the local guards. *Id.* at 7551. UIIS provided this training,

---

**6.** Basic training included training in terrorism and criminality, training in mission emer-

gency plans, and training in access control. Def. Mem., Exhibit 3 at 7498–99.

and supervised the local guards in Nairobi, Kenya.

The Court is precluded from entertaining Plaintiffs' claims based on the actions of UIIS and the local guards it supervised for two reasons. First, the United States is immune from such claims of negligence pursuant to the foreign country exception. It is clear that "torts occurring on American embassies ... which are located in foreign countries are barred by the foreign country exception." *Beattie* 756 F.2d at 97. Thus, actions taken by local guards on the day of the terrorist bombing clearly arose in a foreign nation and cannot be the subject of a claim brought under the FTCA. Second, the training, or lack thereof, that Plaintiffs complain of, also took place in Kenya, and not in the United States. Plaintiffs fail to demonstrate activities occurring within the United States that act as a basis for claims based on the failure to provide proper training to the local guards.

Moreover, the FTCA waiver of immunity does not cover tortious acts or omissions committed by independent contractors or their employees. *See* 28 U.S.C. § 1346 (sovereign immunity is waived only as to acts and omissions of federal employees; independent contractors are not federal employees); *United States v. Orleans,* 425 U.S. 807, 813, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The FTCA waives sovereign immunity for tortious actions undertaken by "officers or employees of any federal agency ... and persons acting on behalf of a federal agency in an official capacity." 28 U.S.C. § 2671. A federal agency is defined as "the executive departments ... independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States *but does not include any contractor with the United States.*" *Id.* (emphasis added).

■ Plaintiffs contend that the United States supervised the day to day operations of UIIS, and thus, under the "control of physical conduct" test, UIIS was not a contractor with the United States, but rather an employee. Pl. Opp'n at 24. The crucial factor in distinguishing between a federal employee and an independent contractor is whether the Federal Government has the power to "control the detailed physical performance of the contractor." *Orleans,* 425 U.S. at 814–815, 96 S.Ct. 1971 (quoting *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973)). Broad supervisory control, even on a daily basis, does not suffice to demonstrate control over the physical performance of the contractor. *Orleans,* 425 U.S. at 817, 96 S.Ct. 1971 (finding that the fact that an independent community agency was required to comply with extensive government regulations did not create an employment relationship); *see also Gibson v. United States,* 567 F.2d 1237 (3d Cir.1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978) ("The fact of broad, supervisory control, or even the potential to exercise detailed control, cannot convert a contractor into an agent, nor can it be the basis for imposing vicarious liability on the United States."). The United States Supreme Court explained in *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), that guidance from the government or requirements that a contractor comply with government regulations, does not establish the type of control necessary to form an employee—employer relationship under the FTCA. The Court found that an employee—employer relationship did not exist between the United States and a local county jail although the jail was required to comply with Bureau of Prisons' rules and regulations prescribing standards of treatment, and although the

United States reserved the right to inspect the jail. *Logue,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121. Similarly, the *Orleans* Court concluded that although the community action agencies at issue in that case were required to "comply with extensive regulations, which include employment policies and procedures, lobbying limitations, accounting and inspection procedures, expenditure limitations and programmatic limitations and applications procedures," the agencies were not "employees" under the FTCA. *Orleans,* 425 U.S. at 817–18, 96 S.Ct. 1971. The *Orleans* Court noted that to find otherwise would "distort well established concepts of master and servant relationships and extend the meaning of the Federal Tort Claims Act beyond the intent of Congress." *Id.* at 819, 96 S.Ct. 1971.

In this instance, it is clear that the United States, while retaining broad supervisory control over the local guards pursuant to the contract with UIIS, did not maintain control over the detailed physical performance of the contract. DOS regulations clearly state that "day to day activities are to be managed by and supervised by the contractor." Def. Reply Mem. at 18, Exhibit 9, 12 FAM 324.2(a). Plaintiffs assert that Defendant controlled the activities of the contractor in that the contract required the contractor to submit the names and information for each employee hired in order for the United States to undertake a security check of the potential employee. Pl. Opp'n at 24–25; Def. Mem, Exh. 3 at 7494. Additionally, the government contract set forth certain standards of conduct that the UIIS was required to comply with, including requiring UIIS to "maintain satisfactory standards of employee competency" and to require certain uniforms approved by the United States. *Id.* Further, UIIS needed to ensure that local guards met the United States' requirements for education, language proficiency and health. *Id.* The contract also required UIIS to send the local guards it hired to orientation, and to provide certain specific training, including training in which the Embassy Regional Security Officer ("RSO") took part. *Id.* at 7498. Review of the UIIS contract, Def. Mem, Exh. 3, makes clear that Plaintiffs have not demonstrated that Defendant retained control over the detailed physical performance of the contractor, but rather, that the contract set forth detailed guidelines and regulations that the contractor was required to conform with as it implemented its hiring, supervision and training of Embassy local guards. As in *Orleans,* this type of general supervisory control that requires the contractor to comply with regulations and guidelines issued by the government, does not create the type of employee—employer relationship envisioned under the FTCA. The government may "fix specific and precise conditions to implement federal objectives" within a contract with an independent contractor. *Orleans,* 425 U.S. at 815–16, 96 S.Ct. 1971 (finding that while the contractor was "responsible to the United States for compliance with the specifications of the contract, or by grant . . . [it was] largely free to select the means of its implementation."). Accordingly, the Court finds that Plaintiffs have not demonstrated that Defendant is liable for the acts of UIIS and the local guards under UIIS' control.

Consequently, the Court lacks jurisdiction to entertain Plaintiffs' claims contained in Count One and Two of Plaintiffs' Complaint and Defendant's motion to dismiss as to these counts must be granted.

D. *Defendant's Motion to Dismiss Plaintiffs International Law Claims for Failure to State a Claim and for Lack of Subject Matter Jurisdiction.*

Count III of Plaintiffs' Complaint attempts to state a claim against the United

States for violations of "principles of international law ... [and] Chapter V of the Constitution of Kenya ..." Cplt. ¶ 100. Plaintiffs assert that the United States' action and inaction related to the 1998 bombing violate both customary international law [7] and the International Covenant on Civil and Political Rights, XXX,1967 6 I.L.M. 368 (*entered into force* Mar. 23 1976, *entered into force for the United States* Sept. 8, 1992). Cplt. ¶ 105. Defendant moves to dismiss Count Three for failure to state a claim and for lack of subject matter jurisdiction. Def. Mem. at 18.

1. *Kenyan Law and the Kenyan Constitution*

 Plaintiffs assert that the United States actions "interfered with the Protection of Fundamental Rights and Freedoms of the Individual, as set forth in Chapter V of the Constitution of Kenya, at sections 70, 72, 74, 76, 80, 81 and 82(2)." Cplt ¶ 100. As discussed at length above, the United States is immune from suit in the federal courts absent an express waiver of sovereign immunity. In this instance, Plaintiffs fail to identify any express waiver of immunity that would permit such a suit against the United States based on the laws of Kenya. Indeed, this is not surprising, as any waiver of immunity with respect to suits brought under foreign law would be inconsistent with the policy scheme embedded in the FTCA; the foreign country exception was added to the FTCA specifically to prevent plaintiffs from subjecting the United States to suits brought pursuant to foreign laws. *See Spelar*, 338 U.S. at 221, 70 S.Ct. 10 (noting that Congress exempted actions arising in foreign countries from the FTCA because "it was unwilling to subject the United

States to liabilities depending upon the laws of a foreign power."). The United States has not waived its immunity with respect to suits brought under foreign law, thus, this Court lacks subject matter jurisdiction over Plaintiffs' claims brought under the Kenyan Constitution or other laws of Kenya.

2. *The International Covenant on Civil and Political Rights*

 Plaintiffs assert that the United States' actions before and after the bombing of the U.S. Embassy in Nairobi violated articles 3, 6, 7, 9, 10, 17, and 26 of the International Covenant on Civil and Political Rights ("ICCPR"). Cplt. ¶ 105. As noted above, in order for the United States to be subject to suit, there must be an express waiver of sovereign immunity. There is no such waiver related to claims brought pursuant to the ICCPR. When the Senate ratified the ICCPR it did so with a declaration that articles 1 to 27 were not self-executing. 138 Cong. Rec. S4784 (daily ed. Apr. 2, 1992). A treaty that is not self executing requires further action by Congress to incorporate it into domestic law and without such action courts may not enforce such a treaty. *See Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir.2001) (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 111 (1987)) ("Courts in the United States are bound to give effect to international law and to international agreements, except that a 'non-self-executing' agreement will not be given effect as law in the absence of necessary authority."). Courts have uniformly held that the ICCPR is not self-executing and that, therefore, it does not give rise to a private right of action. *See, e.g., Igartua De La Rosa v. United States*, 32 F.3d 8, 10 n. 1 (1st Cir.1994) *cert. denied*, 514 U.S.

---

7. Customary international law is defined as "customs and usages among nations of the

world" and it is part of the law of the United States.

1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995) ("Articles 1 through 27 of the Covenant were not self-executing, and could not therefore give rise to privately enforceable rights under United States law".); *Ralk v. Lincoln County*, 81 F.Supp.2d 1372, 1380 (S.D.Ga.2000) (neither legislative nor executive branch intended ICCPR to be self-executing and no private right of action was created); *White v. Paulsen*, 997 F.Supp. 1380, 1387 (E.D.Wash.1998) (ICCPR not self-executing treaty that gives rise to private cause of action); *Reaves v. Warden*, 2002 WL 535398 (M.D.Pa. March 22, 2002) (same); *Weaver v. Torres*, 2000 WL 1721344 (D.Md. November 15, 2000) (dismissing the plaintiff's claim under the ICCPR because it does not create a private right of action). Accordingly, Plaintiffs claim based on the ICCPR must be dismissed for failure to state a claim and for lack of jurisdiction.

### 3. *Alleged Violations of Customary International Law*

■ Plaintiffs assert that "the United States is required to ensure the following rights which have achieved status as customary international law: avoidance of cruel, inhuman or degrading treatment or punishment, avoidance of prolonged arbitrary detention, and avoidance of systematic racial discrimination." Cplt. ¶ 103. The Restatement (Third) of Foreign Relations Law defines customary international law as the "general and consistent practice of states followed by them from a sense of legal obligation." 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 102(2). Certain customary international laws rise to the level of "jus cogens" meaning they are norms that "are recognized by the international community of states as peremptory [norms], permitting no derogation." *Id.* at § 102. The Court of Appeals for the District of Columbia Circuit has noted that not every violation of international law,

even if committed by the United States, is actionable in a United States court. *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 936 (D.C.Cir.1988). The *Citizens Living in Nicaragua* court makes clear that violations of those portions of customary international law that have not achieved *jus cogens* status are clearly not actionable. *Id.*

Plaintiffs have not sufficiently alleged a cause of action under customary international law. Foremost, Plaintiffs have failed to indicate what conduct by the United States violated international law. It appears from the Complaint that Plaintiffs' first allegation regarding "cruel, inhuman, or degrading treatment or punishment," Cplt. ¶ 103, refers to the United States' failure to warn Kenyans of a threat whose validity was in doubt, exclusion of Kenyans from areas around the bombing where rescue and cleanup efforts were ongoing, and a failure to provide the same assistance to Kenyans as the United States provided to its own nationals. The suggestion that such actions rise to a violation of international norms against cruel, inhuman, or degrading punishment lacks merit.

■ Plaintiffs also allege that the United States violated a customary international law norm against "prolonged arbitrary detention." *Id.* This accusation clearly refers to the fact that after the bombing, "Kenyans were denied access" to certain areas, "and their movements and actions were restricted by the United States." Cplt. ¶ 77. Assuming arguendo that such action would qualify as "detention," Plaintiffs have still failed to allege that the action was "prolonged," or "arbitrary." Finally, plaintiffs allege that the United States violated customary international law norms against "systematic racial discrimination" in its handling of events in Kenya

before and after the bombing. *Id.* ¶ 103. However, Plaintiffs fail to allege facts that would demonstrate that the United States' decisions regarding the provision of medical assistance to American nationals but not to Kenyans, rose to the level of systematic discrimination.

In sum, Plaintiffs fail to allege even the basic elements of a violation of the above mentioned international customs. Accordingly, the Court will dismiss Plaintiff's customary international law claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

E. *Constructive Trust/Permanent Injunction*

▓▓▓▓ Count Four of Plaintiffs' Complaint requests that this Court require the United States to hold any seized assets and funds of Osama bin Laden and *al Qaeda* in a constructive trust for the "use, benefit, and enjoyment of the plaintiffs and prospective class members." Cplt. ¶ 109. "A constructive trust is a remedy that a court devises after litigation," *United States v. BCCI Holdings*, 46 F.3d 1185, 1190 (D.C.Cir.1995), "to redress the injustice that would otherwise occur when one person has fraudulently or wrongfully obtained the property of another," *United States v. Taylor*, 867 F.2d 700, 703 (D.C.Cir.1989). As this Court discussed in *Mwani v. United States*, Civ. Action No. 99–125 (Nov. 19, 1999), a constructive trust is not an independent cause of action. As this Court finds that dismissal of Counts One, Two and Three are appropriate, there is no basis on which to award injunctive relief or a constructive trust.

*Political Question Doctrine*

This Court, having concluded that it lacks subject matter jurisdiction over Plaintiffs' claims need not reach the issue of whether the Political Question doctrine bars this Court's review of the claims.

## III. CONCLUSION

Based on the foregoing, the Court finds that Plaintiffs have failed to establish that this Court has subject matter jurisdiction over the claims against the United States alleged in Counts one and two of their complaint. Having failed to do so, the Court concludes that these Counts shall be dismissed with respect to Defendant United States for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The Court also finds that Plaintiffs have failed to state a cognizable claim under international law. Therefore, Plaintiffs' Count Three shall be dismissed with respect to Defendant United States pursuant to Federal Rule of Civil Procedure 12(b)(6). Finally, this Court finds that the because a request for a constructive trust is not an independent cause of action, Count Four must also be dismissed. Accordingly, Defendant's motion to dismiss is granted. An appropriate Order accompanies this Memorandum Opinion.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 29 of July, 2002, hereby

**ORDERED** that Defendant the United States of America's motion to dismiss [# 64] is GRANTED; and it is further

**ORDERED** that this case is DIS-MISSED

**SO ORDERED**.