FILED

MAY 14 2013

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: )<br>)<br>SANJESH PRASAD SHARMA and )<br>ARACELY COLOMBINA SHARMA, )<br>)<br>Debtors. )<br>_____ )<br>)<br>SANJESH PRASAD SHARMA, )<br>)<br>Appellant, )<br>)<br>v. )<br>)<br>CARMEN SALCIDO, )<br>)<br>Appellee. )<br>_____ ) | BAP Nos.  CC-12-1302-MkTaMo<br>CC-12-1520-MkTaMo<br>(Consolidated)<br><br>BK. No.   LA 10-61901 PC<br><br>Adv. No.  LA 11-01555 PC<br><br><br><br><br>**M E M O R A N D U M**[*] |

Argued and Submitted on February 21, 2013
at Pasadena, California

Filed – May 14, 2013

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Peter H. Carroll, Chief Bankruptcy Judge, Presiding

Appearances:     David Brian Lally, Esq. for Appellant, Sanjesh
Sharma; Barak Lurie, Esq., of Lurie & Park, for
Appellee, Carmen Salcido

Before: MARKELL, TAYLOR, and MONTALI,[**] Bankruptcy Judges.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, see Fed. R. App. P. 32.1, it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[**]Hon. Dennis Montali, United States Bankruptcy Judge for the Northern District of California, sitting by designation.

## INTRODUCTION

Appellee Carmen Salcido ("Salcido") sued Debtor-Appellant Sanjesh Prasad Sharma ("Sharma"), seeking a declaration that a loan made by Salcido to Sharma's company — Sharma Developments, Inc. — was nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), (a)(6), and (a)(19).[1]  After Sharma appeared and answered, the bankruptcy court struck Sharma's answer as a discovery sanction, entered default against Sharma, and ordered default judgment in favor of Salcido, but only on her Section 523(a)(2)(A) claim.  After Sharma filed his notice of appeal, the bankruptcy court granted Salcido's motion to amend the judgment to include attorney's fees.  Sharma then appealed both the bankruptcy court's determination of nondischargeability and the award of attorney's fees.  We AFFIRM the determination of nondischargeability and REVERSE the award of attorney's fees.

## FACTS[2]

Salcido made two loans to Sharma.  The first loan was made soon after the two first met.  At that time, Salcido had just taken out a home equity line of credit for $240,000 to start a coffee shop, which never got off the ground, but Salcido still had significant funds from the loan.  The line of credit had a

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532; all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P. 1001–1037; all "Civil Rule" references are to the Federal Rules of Civil Procedure, Fed. R. Civ. P. 1–86; and all "Evidence Rule" references are to the Federal Rules of Evidence, Fed. R. Evid. 101–1103.

[2]These facts are a reformulation of the allegations in the Complaint.

2

significant prepayment penalty, and Salcido told Sharma that she needed to invest the money in a way that would allow her to cover the large payments on the line of credit.

Salcido had met Sharma in his office in April 2005. At that time, he told her that he "flipped" homes — buying, refurbishing, and selling them at a profit. He showed her a list of numerous homes that he claimed to own, and there were numerous people at the office that appeared to be working for him. Sharma repeatedly took steps to impress upon Salcido that he was wealthy and successful: he bragged that he drove luxury cars, took lavish vacations, flew his friends around in private jets, owned multiple race horses, and was in the process of building a "huge, palatial" home for his family. Compl. (Feb. 16, 2011) at ¶ 7. From Salcido's perspective, only a very successful person could afford such things.

Based on these representations of success founded upon a seemingly sound real estate investment strategy, Salcido agreed to lend $240,000 to Sharma. Sharma "guaranteed" that Salcido would make a 20% profit on her "investment." Id. at p. 17. Salcido found this rate of return enticing; she made it clear that she needed the interest to survive and keep her house. When they next met, Salcido gave Sharma a check for $240,000 in exchange for a document entitled "promissory note" and dated May 5, 2005 (the "First Promissory Note"). The term was eight months and the "[t]otal profit to be paid" was $48,000, or 20% of $240,000. Id. The parties to the First Promissory Note were Salcido and Sharma Developments, Inc., on whose behalf Sharma

3

signed.[3]  Salcido did not sign the First Promissory Note.

Sharma ultimately performed under the First Promissory Note, although he did not pay the interest due until March 27, 2006, nearly three months after the eight-month term had ended.

Although Sharma was late with the interest payments, Salcido decided to roll over her investment for another year.  Since taking the first loan from Salcido, Sharma had continued to regale her with stories of wealth and success.  On May 5, 2006, Sharma provided Salcido with another promissory note (the "Second Promissory Note").  The term was one year.  The interest rate was 20% for the first $12,000 of interest and "within 10% to 15% to be determined" for the remaining interest installments.  Id. at p. 19.  Salcido states that the variable interest rate did not comport with the verbal understanding of the parties.  As with the First Promissory Note, Sharma signed the Second Promissory Note on behalf of Sharma Developments, Inc., but Salcido did not sign it at all.[4]

By April 5, 2007, the date that the final installment of interest was due, Sharma had not paid any installments to

[3]Regardless of the identity of the party to this note and the next one, for simplicity we refer to Sharma as the obligor for all purposes.

[4]Although Sharma seems to argue that the $240,000 was not a loan, but rather an investment in real estate, the transaction as pleaded in the Complaint is best construed as a loan.  Sharma alone prepared the documents and titled them "First Promissory Note" and "Second Promissory Note."  The Second Promissory Note has a schedule of "interest" payments and refers to the $240,000 as "principal" — words more consistent with a loan than a capital investment.  Compl. (Feb. 16, 2011) at p. 19.  Finally, Salcido did not sign the documents, a state of affairs more consistent with a promissory note than a joint investment in real estate.

4

Salcido. Salcido called Sharma multiple times (she estimates between five and ten); she literally begged him for the money as she was in "desperate straits with her mortgage." Id. ¶¶ 40, 41. For the next several months, through September 2007, Sharma paid her $1,200 per month. Then he ceased paying altogether.

Salcido made inquiries about what had happened to her money, and found out that Sharma had not refurbished the properties as he told her he would. She learned that he had allowed "some or all of the properties [to] go to utter waste" and that some were even condemned. Id. ¶ 46. Salcido's complaint alleged that she would have never invested with Sharma if she had known about his "failure to maintain and/or actually refurbish the properties that he was investing her money into, and the real state of his finances." Id. ¶ 48.

After these discoveries, Salcido's first legal maneuver was to file suit in the Superior Court of the State of California for the County of Los Angeles (the "Superior Court") for breach of contract and fraud against Sharma Developments, Inc. and Sanjesh Sharma. After meeting with a mediator, the parties agreed to settle all claims in July 2008 and executed a settlement agreement (the "Settlement Agreement"). Under the Settlement Agreement, Sharma Developments was to pay the principal amount — $240,000 — plus interest at 7.00% over a period of five years.

The Settlement Agreement also provided that, in the event of default by Sharma, Salcido would be entitled to file the Stipulation for Entry of Judgment and Judgment (the "Stipulation") that was drafted as part of the Settlement Agreement. Sharma defaulted, and Salcido then filed the

5

Stipulation in December 2008. On December 29, 2008, the Superior Court ordered judgment (the "Stipulated Judgment") against both Sharma Developments, Inc. and Sanjesh Sharma in the amount of $240,000.

Sharma did not make any payments on the Stipulated Judgment. Salcido alleged that Sharma never had any intention of repaying the loans or honoring the Stipulated Judgment — that he "maliciously and fraudulently induced [Salcido] to accept a stipulated Judgment that he never intended on performing, and has made no effort to perform . . . ." Id. ¶¶ 57–58, 64, 65. Furthermore, she alleged that he "set it up so that [Salcido's] and any other judgment would be difficult, if not impossible to collect because he transferred all of his assets to appear insolvent and justify a bankruptcy action." Id. ¶ 58.

On December 3, 2010, Sharma filed Chapter 7. On February 16, 2011, Salcido filed the complaint (the "Complaint") that eventually led to this appeal. Salcido contended that Sharma's $240,000 obligation under the Stipulated Judgment was nondischargeable under Sections 523(a)(2)(A), (a)(2)(B), (a)(4), (a)(6), and (a)(19).

Salcido's argument under Section 523(a)(2)(A) was twofold.[5] First, she contended that Sharma committed fraud by inducing her to loan him money that he never intended to pay back by falsely representing his wealth and success and by lying about his investment strategy of refurbishing properties for sale. Second,

---

[5]We do not discuss Salcido's other claims under Section 523(a) because the bankruptcy court dismissed them and they are not at issue in this appeal.

she contended that he also committed fraud by inducing her to accept the Stipulated Judgment, which he never intended to repay.

Sharma answered and the parties proceeded to discovery. The bankruptcy court, however, ultimately ordered monetary sanctions against Sharma, struck his Answer as a sanction for discovery misconduct, and entered default against him.[6] Salcido then moved for default judgment. She supported the motion with her own declarations and with declarations by Franco Ramirez (her boyfriend then and now) and Michelle A. Seltzer (her attorney).[7] The Motion for Default Judgment largely repeated the facts and allegations of the Complaint. She elaborated on her Section 523(a)(2)(A) argument by alleging that Sharma committed fraud per se by operating a Ponzi scheme. She also argued that Sharma's alleged fraudulent transfers of property to his father and then back to himself for nominal consideration demonstrate an intentional plan to "avoid collection by numerous judgment creditors," including Salcido. Mot. Default J. (Apr. 12, 2012) at 11-12. In essence, she argued that the Stipulated Judgment was merely a delay tactic and that Sharma never intended to honor

_____

[6]On appeal, Sharma does not challenge the sanctions or the entry of default. Consequently, we neither recite the facts underlying the sanctions or the entry of default nor review the merits of those actions.

[7]She also submitted a request for judicial notice under Evidence Rule 201, seeking to have admitted a list of 13 civil cases in Los Angeles County and San Bernardino County against Sharma, Sharma Developments, Inc., or other defendants named in the Complaint. The request states that all of these cases resulted in either a default judgment, stipulated judgment, or are stayed pending Sharma's bankruptcy proceedings. The bankruptcy court did not explicitly rely on these purported facts, and nor do we.

it.

Sharma opposed. He argued that the Section 523(a)(2)(A) claim must fail because Salcido did not meet her burden of proof. He contended that Sharma could not have made any representations to Salcido, false or otherwise, because she did business with Sharma Developments, Inc., not Sharma as an individual, and that she has not alleged that the corporate veil should be pierced. He then asserted that "[o]ne who intends to commit fraud does not repay 33% of the principal debt." Opp'n Mot. Default J. (Apr. 26, 2012) at 3:18. These arguments, however, ignore the fact that the Stipulated Judgment was against both Sharma individually and Sharma Developments, Inc., and that the Stipulated Judgment was for the entire principal amount, $240,000. Lastly, he argued that Salcido's contention that he operated a Ponzi scheme was unfounded.[8]

To support his opposition, Sharma filed various evidentiary objections to the declarations that Salcido submitted in support of her Motion for Default Judgment.

In June 2012, the bankruptcy court ordered default judgment against Sharma (the "Judgment"). Specifically, the court ordered that the $240,000 obligation under the Stipulated Judgment was nondischargeable under Section 523(a)(2)(A). The court denied

---

[8]Sharma is correct. Salcido only offered conclusory allegations to show that Sharma did not invest her funds and in fact used funds from new investors to pay prior investors — the hallmark of a Ponzi scheme. See Donnell v. Kowell, 533 F.3d 762, 767 n.2 (9th Cir. 2008). While we affirm on the grounds that the Complaint supports a determination of fraud under Section 523(a)(2)(A), we do not base that decision on the existence of a Ponzi scheme.

8

attorney's fees without prejudice pending compliance with local bankruptcy rules. The court was silent as to Salcido's other claims under Section 523(a). The court did not articulate its reasoning.

Sharma timely filed a Notice of Appeal, challenging various aspects of the bankruptcy court's grant of the Motion for Default Judgment.

In early July, the Panel requested clarification as to whether the Judgment was interlocutory because the bankruptcy court had not properly dismissed some of Salcido's claims. The bankruptcy court responded with an order dismissing Salcido's claims under Sections 523(a)(2)(B), (a)(4), (a)(6), and (a)(19) against all defendants.

Salcido then moved to amend the Judgment to include attorney's fees and a monetary sanction. Sharma opposed. On October 10, 2012, the bankruptcy court issued an amended judgment (the "Amended Judgment"), which differed from the prior judgment only in that costs and attorney's fees were awarded. However, because the bankruptcy court had by then dismissed all of the Section 523(a) claims other than the one under which Salcido prevailed — Section 523(a)(2)(A) — the Amended Judgment is a final and appealable order. See Dreith v. Nu Image, Inc., 648 F.3d 779, 786 (9th Cir. 2011) (default judgments are appealable final orders).

On October 12, 2012, Sharma timely filed a second notice of appeal challenging the award of attorney's fees in the Amended Judgment. Sharma's two appeals were then consolidated under the first appeal, BAP No. 12-1302.

Sharma did not move for relief from the entry of default under Civil Rule 55(b) or the entry of default judgment under Civil Rule 60(c) in the bankruptcy court.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 1334. We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

1.  Must this court dismiss Sharma's appeal because he did not move for relief from default judgment under Civil Rule 60(b) in the bankruptcy court?

2.  Did the bankruptcy court commit reversible error when it ordered default judgment on Salcido's Section 523(a)(2)(A) claim?

3.  Did the bankruptcy court commit reversible error when it did not hold a hearing on Salcido's Motion for Default Judgment?

4.  Did the bankruptcy court commit reversible error when it issued the Amended Judgment without articulating to what extent, if any, it had considered Sharma's "Opposition to Plaintiff's Motion for Default Judgment" and "Evidentiary Objections to the Declarations of Michelle Seltzer, Carmen Salcido, and Franco Ramirez in Support of Plaintiff's Motion for Default Judgment"?

5.  Did the bankruptcy court commit reversible error when it did not deduct from the $240,000 judgment amount the $86,700 in payments that Sharma made to Salcido?

6.  Did the bankruptcy court commit reversible error when it awarded attorney's fees to Salcido after Sharma had appealed

10

the order of default judgment to this court?

**STANDARDS OF REVIEW**

We review the bankruptcy court's entry of default judgment for abuse of discretion. <u>Eitel v. McCool</u>, 782 F.2d 1470, 1471 (9th Cir. 1986); <u>In re McGee</u>, 359 B.R. 764, 769 (B.A.P. 9th Cir. 2006). Review for abuse of discretion has two parts. First, "we determine de novo whether the bankruptcy court identified the correct legal rule to apply to the relief requested." <u>U.S. v. Hinkson</u>, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc). If so, we then determine under the clearly erroneous standard whether the bankruptcy court's factual findings and its application of the facts to the relevant law were "(1) illogical; (2) implausible; or (3) without support in inferences that may be drawn from the facts in the record." <u>Id.</u> at 1262. In this inquiry, "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 574 (1985).

Whether a bankruptcy court retains authority to order attorney's fees after a notice of appeal has been filed is a question of law that we review de novo. <u>See</u> <u>Jefferies v. Carlson (In re Jefferies)</u>, 468 B.R. 373, 377 (B.A.P. 9th Cir. 2012). We also review de novo whether California law allows for the award of attorney's fees in this context. <u>Fry v. Dinan (In re Dinan)</u>, 448 B.R. 775, 783 (B.A.P. 9th Cir. 2011).

## DISCUSSION

**A. This Court is Not Required to Dismiss the Case as a Result of Sharma's Failure to Move for Relief Under Civil Rule 60(b) in the Bankruptcy Court**

The Ninth Circuit has not definitively established whether dismissal is required when a judgment entered by default is appealed without first seeking review under Civil Rule 60(b), which is applicable here through Rule 9024. One line of cases, on which Salcido relies, holds that an appellant-defendant's failure to move for relief under Civil Rule 60(b) in the district (or bankruptcy) court mandates the dismissal of an appeal before reaching the merits. Consorzio Del Prosciutto di Parma v. Domain Name Clearing Co., LLC, 346 F.3d 1193, 1195 (9th Cir. 2003); Investors Thrift v. Lam (In re Lam), 192 F.3d 1309, 1311 (9th Cir. 1999); First Beverages, Inc. v. Royal Crown Cola Co., 612 F.2d 1164, 1172 (9th Cir. 1980); Rohauer v. Friedman, 306 F.2d 933, 937 (9th Cir. 1962) ("An appeal to this court cannot be used as a substitute for the timely procedure set forth by Rule 60(b).").[9]

With two exceptions, in the above cases the defendant failed to answer or appear. The courts seemed especially troubled by a defendant-appellant's intention to enter the fray for the first time on appeal. "Federal courts are not run like a casino game in which players may enter and exit on pure whim. A defaulted party may not re-enter litigation, particularly on appeal, on sheer caprice. It must follow proper procedure to set aside the

---

[9]We even dismissed a case recently on the same grounds. Nguyen v. Ford (In re Nguyen), 2011 WL 3298962 at *4 (B.A.P. 9th Cir. 2011).

12

default." In re Lam, 192 F.3d at 1311 (applying Rule 7055(c)).

In Rohauer and First Beverages, the two exceptions, the appellant-defendants extensively participated in the proceedings below but sought to raise new factual issues on appeal. Because the appellant-defendants were aware of the new factual circumstances after the entry of judgment and before the notice of appeal was filed, the Ninth Circuit dismissed their appeals. First Beverages, 612 F.2d at 1172 ("[The] proper approach to seeking relief from judgment because of a change in the factual circumstances surrounding this case would be to make a Rule 60(b) motion or a motion to reopen to hear additional proof. Such motions must be directed in the first instance to the district court."); Rohauer, 306 F.2d at 937; Civil Rule 62.1.

In a second line of cases, which Salcido failed to discuss in her brief, the Ninth Circuit and this court elected to review the merits of default judgments even though the appellant-defendants had not moved under Civil Rule 60(b) below. Dreith v. Nu Image, Inc., 648 F.3d 779, 789 (9th Cir. 2011); Alan Neuman Prods., Inc. v. Albright, 862 F.2d 1388, 1391-92 (9th Cir. 1988); Madsen v. Bumb, 419 F.2d 4, 6 (9th Cir. 1969); In re Kubick, 171 B.R. 658, 660 (B.A.P. 9th Cir. 1994).

In these cases, the courts treated the defendant-appellants as if they had applied for relief under Civil Rule 55(c) or 60(b), or both, to avoid an "unduly technical disposition of the case." Madsen, 419 F.2d at 6. In re Kubick was more to the point — "[a]lthough entry of a default judgment is usually attacked collaterally under Rule 60(b), on direct appeal a defendant can contest the legal sufficiency of allegations

13

contained in the complaint." 171 B.R. at 660 (citing <u>Alan Neuman Prods.</u>, 862 F.2d at 1392). The consistent thread running through these cases is that, with one exception (<u>In re Kubick</u>), the appellant-defendants all participated below — by actively communicating with the plaintiff, answering the complaint, participating in discovery, and/or moving to vacate the entry of default under Civil Rule 55(c).

In the most recent of these cases, the Ninth Circuit declined to follow <u>Parma</u> and ruled on the merits when the defendant's answer was struck for discovery misconduct. <u>Dreith</u>, 648 F.3d at 781. The district court entered an order of default upon the stricken answer and six months later granted the plaintiffs' motion for default judgment. <u>Id.</u> On appeal, the defendants only challenged the entry of default. <u>Id.</u> Although the defendants did not seek relief under Civil Rules 55(c) or 60(b) in the district court, the Ninth Circuit decided to "consider the merits of this action, as both public policy and the policy of this court dictate." <u>Id.</u> at 789 n.1. While the court did not overrule <u>Parma</u>, it seems to have softened <u>Parma</u>'s holding. Moreover, the facts of <u>Dreith</u> are analogous to those in the prior Ninth Circuit and BAP cases where the courts did not require a Rule 60(b) motion below in that the appellant-defendant had participated in the trial court proceedings.

There is yet a third line of cases where the Ninth Circuit and this court have reviewed the trial courts' grant of default judgment without even discussing the import, or lack thereof, of a Civil Rule 60(b) motion below. <u>See, e.g.</u>, <u>Televideo Sys.</u>, 826 F.2d 915; <u>Eitel</u>, 782 F.2d 1470; <u>In re Pryor</u>, 2011 WL 4485796

14

(B.A.P. 9th Cir. 2011); In re McGee, 359 B.R. 764. In these cases, like those above that expressly reject the Civil Rule 60(b) requirement, the appellant-defendants all participated to some degree at the trial court.

While not articulated as such by the Ninth Circuit, the rule seems to be that a case will be dismissed on appeal for failure to move for relief under Civil Rule 60(b) only when the appellant-defendant failed to participate in the trial (or bankruptcy) proceedings or when the appeal raises new factual issues. For policy reasons, this is the correct rule.

It would be a waste of time and resources to dismiss the current appeals. If Sharma had not participated at the bankruptcy court, then there may have been some benefit to having him air his arguments at the bankruptcy court. But given his extensive participation — answering the Complaint and engaging in discovery — we would not likely gain any new information upon which to base a decision if Sharma moved for relief under Rule 60(b), was denied that relief (presuming without deciding that the bankruptcy court would deny the motion), and then returned to this court.

In addition, Sharma is not raising any new factual issues, only arguing that the record does not support a determination of fraud under Section 523(a)(2)(A). Thus, we have sufficient policy and precedential support to proceed to the merits.[10]

---

[10]We note that the Ninth Circuit is one of few federal courts of appeals that refuses to hear direct appeals from default judgments in some circumstances, and that the Restatement of Judgments supports direct appeals from default judgments. See (continued...)

15

**B.    The Bankruptcy Court Did Not Abuse its Discretion When It Ordered Default Judgment on Salcido's Section 523(a)(2)(A) Claim**

Before discussing the merits of the nondischargeability claim, we need to examine the effect of the entry of default. "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." Televideo Sys., 826 F.2d at 917-18 (internal quotation marks and citation omitted). However, a default does not operate as "an absolute confession of liability, for the facts alleged in the complaint may be insufficient to establish liability." In Re McGee, 359 B.R. at 771. "A default establishes the well-pleaded allegations of a complaint . . . ." Id. at 772 (internal quotation marks and citation omitted) (emphasis in original).

> Facts that are not well pled include allegations that are made indefinite or erroneous by other allegations in the same complaint, . . . allegations which are contrary to facts of which the court will take judicial notice, or which are not susceptible of proof by legitimate evidence, or which are contrary to uncontroverted material in the file of the case.

Id. (internal quotation marks and citation omitted) (emphasis in original). Put another way, the burden of proof remains with the plaintiff after the entry of default; the plaintiff is not entitled to default judgment as a matter of right. See id. at 771, 774.

While the bankruptcy court has an independent duty to

---

[10](...continued)
Commonwealth Dev. Auth. v. Camacho, 2010 WL 5330503 at *6-*8 (N. Mar. I., December 21, 2010) (surveying the federal courts of appeals) (citing Restatement (Second) of Judgments § 78 cmt. e (1982)).

16

determine the sufficiency of a claim, it operates with wide discretion. Id. at 773; In re Kubick, 171 B.R. at 662. Under Civil Rule 55(b), a bankruptcy court has the discretion to require that the plaintiff prove up the facts necessary to determine whether a valid claim exists against the defaulting party. In re McGee, 359 B.R. at 773. The court may "conduct hearings or make referrals" to "determine the amount of damages; . . . establish the truth of any allegation by evidence; or . . . investigate any other matter." Fed. R. Civ. P. 55(b)(2).

A prove-up hearing is only required where the damages are unliquidated or not capable of mathematical calculation. Davis v. Fendler, 650 F.2d 1154, 1161 (9th Cir. 1981). Civil Rule 55(b) does not require a hearing to investigate facts not related to damages, since the default itself establishes those facts as alleged in the complaint. Televideo Sys., 826 F.2d at 917–18.

One issue on appeal is whether the bankruptcy court was required to hold a prove-up hearing, as Sharma argues, "in light of (1) the Opposition and Evidentiary Objections filed by Appellant; and (2) the unusual circumstances of this case[.]" Appellant's Am. Opening Br. (Aug. 20, 2012) at ¶ 13. As set forth above, a bankruptcy court has wide discretion to determine whether a prove-up hearing is necessary. If a bankruptcy court determines that the facts as alleged in the complaint support the plaintiff's claim, then a prove-up hearing is only necessary to fix unliquidated damages. See Davis, 659 F.2d at 1161.

Here, the bankruptcy court ordered default judgment without a prove-up hearing. It did not state which of Salcido's filings

17

it had considered or whether it had considered Sharma's opposition and evidentiary challenges. Nor was it required to do so. Civil Rule 55(b) does not require that the court consider a defendant's challenges to default judgment. Once Sharma was in default, the only issue before the bankruptcy court was whether the well-pleaded factual allegations in the Complaint, deemed true, supported a claim under Section 523(a)(2)(A), and, if not, whether additional proof was necessary. The bankruptcy court determined that a hearing was not necessary on the issue of liability, and it had the discretion to do so. Salcido's motion and Sharma's opposition amounted to argument about whether the facts in the Complaint supported Salcido's claim.

Even if the evidence submitted by Salcido in the form of declarations were inadmissible, an issue which we do not decide, the Amended Judgment is not defective as the result of the bankruptcy court not expressly stating that it had considered Sharma's opposition and evidentiary objections. The factual content in the challenged declarations was nearly identical to that in the Complaint, and thus any reliance the bankruptcy court may have placed on the declarations was harmless. See Fed. R. Evid. 103(a).

So long as the bankruptcy court found sufficient evidence in the Complaint's allegations to support the determination of liability under Section 523(a)(2)(A), its decision survives. The bankruptcy court did not commit reversible error when it determined the issue of liability without a hearing. See Davis, 659 F.2d at 1161. Nor did it commit reversible error when it did not articulate to what extent, if any, it considered Sharma's

18

opposition to the Motion for Default Judgment and his evidentiary objections. See Fed. R. Civ. P. 55(b); Fed. R. Evid. 103(a).

We next turn to the issue of whether a hearing was required to fix the damages. The precise issue is whether the bankruptcy court properly gave preclusive effect, under the doctrine of issue preclusion, to the damage amount — $240,000 — that the Superior Court ordered upon the Stipulated Judgment. Under 28 U.S.C. § 1738, the Full Faith and Credit Act, federal courts must apply the preclusion law of the state whose court issued the prior judgment. Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1245 (9th Cir. 2001) (citations omitted).

Under California law, issue preclusion bars the relitigation of an issue if (1) the issue in the first and second action are identical; (2) the issue was actually litigated and necessarily decided in determining the first action; (3) the parties against which issue preclusion is asserted are identical or in privity; and (4) the prior decision was on the merits. See Daar & Newman v. VRL Intl., 28 Cal. Rptr. 3d 482, 571, 129 Cal. App. 4th 482, 488–89 (2005); Pajaro Valley Water Mgmt. Agency v. McGrath, 27 Cal. Rptr. 3d 741, 745–46, 128 Cal. App. 4th 1093, 1099–1100 (2005).

Here, the relevant parties in both actions are identical[11] and the issue of damages is identical. The Stipulated Judgment was final and on the merits. See Cal. State Auto. Assoc. Inter-

---

[11]The adversary complaint names various defendants who were not involved in the State Court Action, but Salcido prevailed in both state court and bankruptcy court, and Sharma was individually liable under both the state court Stipulated Judgment and bankruptcy court Amended Judgment.

19

<u>Ins. Bureau v. Superior Court</u>, 50 Cal. 3d 658, 663–65, 268 Cal. Rptr. 284, 287–88 (1990). Finally, the issue was actually litigated because the parties themselves fixed the damages amount in the Settlement Agreement, and necessarily decided because the damages amount is on the face of the Stipulated Judgment. The Stipulated Judgment liquidated the damages. Consequently, the bankruptcy court was not required to hold a prove-up hearing for damages. <u>See</u> <u>Davis</u>, 659 F.2d at 1161.

Sharma argues that the bankruptcy court should not have given preclusive effect to the facts underlying the Stipulated Judgment because it included no findings of fact. Sharma is correct on the law, but there is no indication that the bankruptcy court gave preclusive effect to the Stipulated Judgment for any issue aside from damages. Again, so long as the facts in the Complaint support a determination of liability, the Amended Judgment survives.

We now turn to the heart of this appeal — the issue of whether the facts alleged in the Complaint, and deemed true upon Sharma's default, support the bankruptcy court's determination of nondischargeability under Section 523(a)(2)(A). We may affirm the bankruptcy court's decision on any ground finding support on the record. <u>Eitel</u>, 782 F.2d at 1471. As discussed above, we review for abuse of discretion. <u>Hinkson</u>, 585 F.3d at 1262. So long as the bankruptcy court applied the correct legal rule, we reverse only if the bankruptcy court's application of the law to the facts was "illogical, . . . implausible, . . . or without support in inferences that may be drawn from the record" — in other words, clearly erroneous. <u>Id.</u>

20

The first issue is whether the bankruptcy court applied the correct legal rule. There can be no doubt that it did. Section 523(a)(2)(A) is often litigated in bankruptcy court; the Complaint clearly identified the claim under this section; and the Judgment (and Amended Judgment) specify that relief is afforded under this section.

The Ninth Circuit has established a multi-factor test for the consideration of default judgments:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel, 782 F.2d at 1471–72.

**1. Prejudice**

The issue is whether Salcido, if the court had not entered default judgment, would have suffered lengthy and costly delays or been left without other recourse for recovery or the means to prevent ongoing harm. See IO Group, Inc. v. Jordan, 708 F. Supp. 2d 989, 997 (N.D. Cal. 2010); Warner Bros. Entm't Co. v. Caridi, 346 F. Supp. 2d 1068, 1072 (N.D. Cal. 2004); Phillip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 499 (C.D. Cal. 2003). Sharma's discovery misconduct led to delays in the adversary proceeding and increased costs to Salcido (e.g., increased legal fees to prepare motions for sanctions). If the default judgment had not been entered, then the harm, in the form of not being able to pursue relief under the Stipulated Judgment due to the automatic stay, would have continued. Salcido would

21

have certainly suffered prejudice had default judgment not been entered.

### 2. Merits of Plaintiff's Substantive Claims and Sufficiency of the Complaint

The second and third factors, taken together, require that Salcido assert a claim upon which she may recover. IO Group, 708 F. Supp. 2d at 997. Default judgment is favored where "the complaint sufficiently states a claim for relief under the 'liberal pleading standards embodied in Rule 8' of the Federal Rules of Civil Procedure." Stephens Media LLC v. CitiHealth, LLC, No. 2:09-cv-02285-MMD-RJJ, 2012 WL 4711957 (D. Nev. Oct. 3, 2012) (quoting Danning v. Lavine, 572 F.2d 1386, 1389 (9th Cir. 1978)). In other words, the complaint must plead facts which, if taken as true, plausibly give rise to liability for fraud under Section 523(a)(2)(A). Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). For default judgment based solely on the complaint, without the benefit of a prove-up hearing, the facts in the complaint must go beyond being well-pled; they must support the ultimate determination of liability. In this circumstance, the two factors collapse into a single analysis because if a complaint supports a determination of liability, the claim(s) upon which that liability is based were perforce well-pled.

Section 523(a)(2)(A) excepts from discharge debts incurred under false pretenses, based on false representations, or actual fraud. 11 U.S.C. § 523(a)(2)(A) (2012). To establish fraud under this section, the following five elements must be proven by a preponderance of the evidence: (1) the debtor made a representation; (2) the debtor knew that the representation was

22

false at the time he or she made it; (3) the debtor made the representation with the intent to deceive; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained damage as a proximate result of the misrepresentation having been made. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010).

The execution of a contract is an implied representation of intent to honor its terms. See Karelin v. Bank of Am. Nat'l Trust and Savs. Ass'n (In re Karelin), 109 B.R. 943, 947 (B.A.P. 9th Cir. 1990).

Knowing falsity requires that Sharma either knew at the time he made the representations at issue that they were false or recklessly disregarded their truth. In re Sabban, 600 F.3d at 1222; Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 167 (B.A.P. 9th Cir. 1999). "A representation may be fraudulent, without [actual] knowledge of its falsity, if the person making it 'is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as represented.'" In re Gertsch, 237 B.R. at 168 (quoting Restatement (Second) of Torts § 526 cmt. e (1977)).

Intent to deceive may be inferred from the totality of circumstances. Citibank (S.D.), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1087 (9th Cir. 1996) ("A court may infer the existence of the debtor's [deceptive] intent . . . if the facts and circumstances . . . present a picture of deceptive conduct by the debtor."). "The debtor's assertions of an honest intent must be weighed against natural inferences from admitted facts."

23

4 Collier on Bankruptcy ¶ 523.08[2][e][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). A court may also infer intent to deceive where the debtor makes a false representation that the debtor knows, or should know, will induce the creditor to make a loan. Cf. In re Gertsch, 237 B.R. 160 (upholding nondischargeability determination under Section 523(a)(2)(B) where debtor knowingly provided false income and asset information on loan application). Finally, intent to deceive may be inferred if a debtor takes no steps to perform under a contract. Merchs. Nat'l Bank & Trust Co. of Indianapolis v. Pappas (In re Pappas), 661 F.2d 82, 86 (7th Cir. 1981).

Justifiable reliance is a subjective standard that turns on a person's knowledge under the particular circumstances. In re Eashai, 87 F.3d at 1090. "'Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" Id. (quoting Field v. Mans, 516 U.S. 59, 70 (1995)). The justifiable reliance standard generally does not entail a duty to investigate, and a person may be justified in relying on a representation of fact even if he might have ascertained the falsity of the representation had he investigated. See Field, 516 U.S. at 70. A duty to investigate, however, is imposed on a creditor by virtue of suspicious circumstances. Id. at 71; see Wheels Unlimited, Inc. v. Sharp (In re Sharp), 2009 WL 511640 (Bankr. D. Idaho 2009). Thus, "justifiable reliance does not exist where a creditor ignores red flags." Mandalay Resort Grp. v. Miller (In re Miller), 310 B.R. 185, 198 (Bankr. C.D. Cal.

24

2004) (citing In re Anastas, 94 F.3d at 1286). "[A] person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth." In re Eashai, 87 F.3d at 1090-91.

The bankruptcy court did not clearly indicate on which instance of alleged fraud — inducement of the promissory notes or inducement of the Settlement Agreement — it based the default judgment. Nor did the bankruptcy court make any specific findings of fact. With respect to the Section 523(a)(2)(A) claims, the Amended Judgment only states,

> ORDERED that the judgment entered for Plaintiff, Carmen Salcido and against Defendant, Sanjesh Sharma in the amount of $240,000 in Case No. KC051243, styled Salcido v. Sharma Developments, Inc., et al., in the Superior Court of California, County of Los Angeles, on December 29, 2008, is nondischargeable under 11 U.S.C. § 523(a)(2)(A)[.]

Am. J. (Dec. 6, 2012).

We first note that the novation worked by the Settlement Agreement is not a bar to inquiry about the underlying fraud claim. Archer v. Warner, 538 U.S. 314, 323 (2003) (The "settlement agreement and releases may have worked a kind of novation, but that fact does not bar the [plaintiffs] from showing that the settlement debt arose out of . . . fraud[.]" (internal quotation marks and citation omitted)). Consequently, the bankruptcy did not err by looking beyond the Settlement Agreement to assess the fraudulent inducement of the promissory notes.

But a fair reading of the bankruptcy court's order is that the court also relied on the fraud inducing the Settlement Agreement. The reference to the state court Stipulated Judgment,

25

which directly flowed from the Settlement Agreement, indicates that the court did not solely rely on the fraud inducing the promissory notes. We need not determine on which instance the bankruptcy court relied, however. Because we can affirm on any ground in the record, Eitel, 782 F.2d at 1471, we separately analyze both instances of alleged fraud to determine if either (or both) support the bankruptcy court's decision.

### a. Inducement of the Promissory Notes

As the bankruptcy court did not explain its reasoning in the Amended Judgment, the bankruptcy court would have been entirely justified in relying on inferences drawn from the facts in the Complaint to determine that Sharma had violated Section 523(a)(2)(A). To assess these inferences, we first look at the Complaint:

Plaintiff told Sharma that she needed to invest this money, $240,000 in all, in something that would make her money right away to cover her now large mortgage payment. . . .

. . . Sharma told [Salcido] that he would buy homes, refurbish them, and resell them at a profit. Sharma made many efforts to impress [Salcido] with his wealth and success. Sharma suggested that [Salcido] meet him at his office[,] where [he] had numerous people who appeared to be working for him. He also claimed to own many properties and showed [Salcido] a list of the numerous homes that he claimed to own. . . .

. . . Sharma also made efforts on repeated occasions in person with both [Salcido] and Franco present in order to impress them with his success and wealth. Sharma bragged that he drove nice cars (a Bentley, an S-Class Mercedes, and a Range Rover, all newer models), took lavish vacations, including to the World Cup, flew his friends around in private jets, owned multiple race horses, and was in the process of building a huge, palatial home with over 14 flat screen televisions for just himself, his wife, and two children. Sharma presented himself in very nice clothes and his office was extremely nice, especially to a simple person like [Salcido]. To [Salcido], no one could afford these

26

things unless they were very successful. Neither [Salcido] nor Franco knew anyone with this level of wealth and success and both felt totally impressed and in awe of Sharma. . . .

. . . Sharma guaranteed to [Salcido] that she would make a 20% profit on investments. . . .

The interest that Sharma promised was particularly enticing to [Salcido] because this amount would cover [Salcido's] mortgage, taxes, and leave her with a little spending money. [Salcido] cried to Sharma about how she had a huge mortgage payment at an advanced age in life and desperately needed the interest to survive. . . .

[Salcido] let Sharma know that she would like to invest. . . .

Sharma and [Salcido] had a second meeting at Sharma's office and again with Franco present. At that time, [Salcido] gave Sharma a check for $240,000. Sharma gave [Salcido] a check, as well, which he told her was an up front payment for interest, to help induce [Salcido] that he had the money to cover the interest and payments. . . .

After [Salcido] provided Sharma and his company with the check for $240,000 [on May 5, 2005], Sharma Developments, Inc. provided [Salcido] payments totaling $31,300 on May 5, 200[5] and September 1, 2005. . . .

. . . Sharma gave [Salcido] these large payments to further entice her to believe him, further impress [her] with his wealth, and make her feel a false sense of security regarding her investment.

Compl. (Feb. 16, 2011) at ¶¶ 5–7, 10–14, 25, 27.

By March 27, 2006, nearly three months after the term under the First Promissory Note had expired, Sharma had paid Salcido the entire interest amount due — $48,000. The Complaint continues:

The first year, Sharma may have been late with interest payments, but [Salcido] was willing to work with this. . . . He always seemed to make a check available, and then would tell them about his lavish lifestyle, including his travels and expensive purchases. With these stories of his great wealth and his always managing to pay [Salcido], even if sometimes late,

27

[Salcido] did not worry and felt that Sharma would always pay her eventually. . . .

Because the interest payments seemed profitable to [Salcido] that first year, even if they were sometimes sporadic, [Salcido] agreed to roll over her initial investment for another year with Sharma in May 2005. . . .

. . . Sharma had not refurbished the properties in order to flip them, as he had told her. After [Salcido] invested with [Sharma], she began to find out that they had let some or all of those properties go to utter waste. Some even ended up being condemned during the time that [Salcido] was still dealing with [Sharma] and actively investing with him. . . .

. . . Sharma did nothing but sell [Salcido] a "bill of goods" and return pennies to her of her own money while he ran off with the rest of the investment. . . .

Had Plaintiff known the truth about Sharma, his failure to maintain and/or actually refurbish the properties that he was investing her money into, and the real state of his finances, she never would have invested with him. . . .

. . . [Sharma] never intended to repay [Salcido] for the money she loaned him.

Id. ¶¶ 31–32, 46–48, 50, 64.

Taking the above factual allegations as true, we cannot say that the bankruptcy court erred in making the inferences necessary to support a determination of nondischargeability under Section 523(a)(2)(A) for fraudulent inducement of the promissory notes. The following conclusions are neither illogical, implausible, or without support in inference that may be drawn from facts in the record: (i) Sharma represented that he was wealthy and successful, and that he would invest the loan proceeds into flipping real estate; (ii) he knew these

28

representations were false at the time he made them;[12] (iii) he made the representations with the intent to deceive Salcido;[13] (iv) Sharma justifiably relied on the representations; and (v) Salcido sustained damage — the loss of $240,000 in loan principal — as a proximate result of the misrepresentations. Hinkson, 585 F.3d at 1261–62.  Although there may be other permissible views of the evidence, Sharma has put forth none that render this view clearly erroneous.  Anderson, 470 U.S. at 574.

---

[12]Sharma argues that the loan proceeds were in fact used for "real estate development."  Appellant's Am. Opening Br. (Nov. 14, 2012) at ¶ 17.  It is possible that Salcido and Sharma are both correct — that the funds were used for real estate development and that some of the related properties went to utter waste. Sharma, however, does not substantiate his assertion of how the funds were used, and, more importantly, does not refute Salcido's allegation that he was not refurbishing and selling the properties as he promised he would do.  Sharma represented that he would flip the properties, not just invest the loan proceeds in "real estate development."

[13]Sharma's argument that "one who intends to commit fraud does not take funds and repay it" is unavailing.  Id. ¶ 24. Sharma has not repaid any of the principal amount, and a party who wishes to defraud another may be incentivized to make several payments to establish trust and induce further "investments." The facts here illustrate the premise that trust is the foundation of a good con.  Salcido agreed to roll over her loan in the Second Promissory Note based on Sharma's performance (albeit untimely) under the First Promissory Note.

Sharma's argument that Salcido "assumed the risk" is equally unavailing.  Id. ¶ 26.  A creditor only assumes the risk that the borrower will be unable to repay the loan, not that the borrower does not intend to repay the loan in the first place.  See In re Karelin, 109 B.R. at 947.  Put another way, the act of borrowing implies an intent to repay the loan.  In any event, the fraud here is not the deception as to intent to pay but deception about the ability to pay.

29

## b. Inducement of the Settlement Agreement

Concerning this instance of fraud, the Complaint alleges:

On or about August 7, 2008, Sharma stipulated to a judgment against his companies and him personally for $240,000. . . .

Sharma never made any payment on that Judgment.

Sharma never had any intention of honoring that Judgment.

Sharma maliciously and fraudulently induced [Salcido] to accept a stipulated Judgment that he never intended on performing and has made no effort to perform upon. . . . Sharma set it up so that [Salcido's] and any other judgment would be difficult, if not impossible, to collect because he transferred all of his assets to appear insolvent and justify a bankruptcy action.

Sharma transferred assets and directed people within his business to transfer assets from himself to others to appear insolvent.

[Sharma] . . . entered into stipulations and agreements for payment, including the Stipulated Judgment, in bad faith and with no intent to ever perform . . . .

[Salcido] incurred damages as a result of the foregoing . . . .

Compl. (Feb. 16, 2011) at ¶¶ 53, 56–58, 60, 66, 68.

As with the promissory notes, we cannot say that the bankruptcy court erred in relying on these factual allegations to make the inferences necessary to support a determination of nondischargeability under Section 523(a)(2)(A) for fraudulent inducement of the Settlement Agreement. The following conclusions are neither illogical, implausible, or without support in inference that may be drawn from facts in the record: (i) Sharma represented that he would honor the Settlement Agreement; (ii) he knew that representation was false at the time he made it; (iii) he made the representation with the intent to

30

deceive Salcido; (iv) Salcido justifiably relied on the representation; and (v) Salcido sustained damage — forestalled collection remedies now valued at zero because the bankruptcy filing prevents a return to state court, and less favorable payback terms (five years at 7% under the Settlement Agreement compared to immediate payment with 10% post-judgment interest upon a judgment in state court[14]) — as a proximate result of the misrepresentation.  <u>Hinkson</u>, 585 F.3d at 1261-62.  Although there may be other permissible views of the evidence, Sharma has put none forth that render this view clearly erroneous.  <u>Anderson</u>, 470 U.S. at 574.

As the record supports a determination of fraud in the inducement as to the promissory notes and as to the Settlement Agreement, the third and fourth <u>Eitel</u> factors strongly weigh in favor of affirmance.

We now return to the remainder of the <u>Eitel</u> factors.

**3.    Sum of Money at Stake**

Under this factor, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct."  <u>PepsiCo, Inc. v. Cal. Security Cans</u>, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002).  Where the amount of money is high and the seriousness of conduct is low, default judgment is disfavored.  <u>See</u> <u>id.</u> at 1176-77.  Similarly, if the plaintiff seeks equitable relief and the defendant's conduct was severe, default judgment is favored.  <u>Id.</u>  Although here the amount of money is significant — $240,000 — it is outweighed by the

_____

[14]Cal. Code Civ. Proc. § 685.010 (West 2012).

31

seriousness of Sharma's fraudulent conduct. The allegations of the Complaint are that he misled Salcido, an unemployed person in dire straits, and thereby induced her to hand over the proceeds of a home equity line of credit — a line of credit whose payments he knew depended on the performance of investments which he did not even make. This factor strongly favors upholding the Amended Judgment.

### 4. Possibility of Dispute Concerning Material Facts

This factor "considers the possibility of a dispute concerning material facts." In re Eitel, 782 F.2d at 1471–72. The more precise question is whether there is even a possibility of a dispute concerning material facts as a result of the default. See Cal. Security Cans, 238 F. Supp. 2d at 1176; Caridi, 346 F. Supp. 2d at 1072. The answer is no. We rely only on the facts alleged in the Complaint (deemed true by operation of Sharma's default). Thus, there is no possibility of disputing the material facts contained in the Complaint, as Sharma's own actions resulted in the entry of default and the consequent position that the well-plead allegations of the Complaint were undisputed. See Caridi, 238 F. Supp. 2d at 1072.

### 5. Default Due to Excusable Neglect

Default judgment is generally disfavored where default resulted from excusable neglect. "A defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and failed to answer." Meadows v. Dominican Republic, 817 F.2d 517, 521 (9th Cir. 1987). Sharma's behavior went well beyond failing to answer a properly-served complaint. He answered and actively participated in discovery. His

32

discovery abuse led to sanctions, including striking his Answer, which in turn led directly to the entry of default. This factor strongly favors upholding the Amended Judgment.

**6.    Policy Favoring Decisions on the Merits**

While there is a "strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits," In re Eitel, 782 F.2d at 1470, this factor standing alone is insufficient to prevent entry of default judgment. Caridi, 346 F. Supp. 2d at 1073. As this is the only factor in Sharma's favor, it does not carry sufficient weight to justify reversing the Amended Judgment. Id.

Because the Eitel factors strongly weigh in favor of upholding the Amended Judgment in the amount of $240,000,[15] we have no difficulty doing so.

Even if the Eitel factors did not weigh so heavily, we would likely affirm in any case because of the potential negative effects of a reversal. In this specific context — a default judgment following sanctions for discovery abuse that include a stricken answer — a reversal would likely lead to the bankruptcy court allowing the plaintiff to amend her complaint. The defendant would then have the opportunity to file an answer. The

---

[15]We do not credit the $86,700 that Sharma paid to Salcido against the $240,000 loan principal. Sharma agreed to liability for $240,000 in the Stipulated Judgment after he had made the $86,700 payments to Salcido. To the extent that anyone has a complaint about the judgment amount, it would be Salcido as she may have had a right to seek additional amounts for interest incurred. But she also agreed to the judgment amount in the Stipulated Judgment. Thus, neither party has grounds to challenge the judgment amount and $240,000 is the correct figure.

sting of the sanction striking the answer would thus be removed, as the defendant would ultimately have the opportunity to challenge the plaintiff's factual allegations. A defendant's obstruction and malfeasance in discovery, which is the very process by which a plaintiff obtains information necessary to prove the facts plead in the complaint, would thus be rewarded. Instead of moving to dismiss under Civil Rule 12(b)(6) for failure to state a claim or moving for summary judgment under Civil Rule 56, a defendant believing that either the complaint is insufficient or that the plaintiff has insufficient facts to proceed to trial could affirmatively thwart a plaintiff's discovery efforts with the knowledge that a stricken answer will merely lead to an amended complaint and the opportunity to replead the answer. In addition, the plaintiff would lose the opportunity to meaningfully amend its pleadings under Rule 7015 because the plaintiff would not be able to discover the very facts that would support such amendment. Rule 7015.

Moreover, there is a strong inference that the court believed in the sufficiency of the Complaint and intended striking the answer to be a terminating sanction. If not, the Judgment would not have followed so closely behind the sanction order and/or the bankruptcy court would have held a prove-up hearing to determine liability. If the Complaint were insufficient to support liability, striking the answer would have been an essentially meaningless action as Salcido's only avenue for relief would have been to amend the Complaint, which in turn would have given Sharma the opportunity to replead the answer. If we were to reverse, we would be diminishing the bankruptcy

34

court's power to monitor the litigation before it by making terminating sanctions partially or completely irrelevant. See In re Nguyen, 447 B.R. 268, 280 (B.A.P. 9th Cir. 2011) (en banc) ("Bankruptcy courts have the inherent authority to regulate the practice of attorneys who appear before them.") (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43–45 (1991)). We refuse to condone the behavior that would likely follow from a reversal.

We now turn to the issue of attorney's fees.

**C. The Bankruptcy Court Erroneously Awarded Attorney's Fees to Salcido.**

**1. The Bankruptcy Court's Jurisdiction to Award Attorney's Fees**

The effective filing of a notice of appeal transfers jurisdiction from the bankruptcy court to this court with respect to all matters involved in the appeal. See Masalosalo by Masalosalo v. Stonewall Ins. Co., 718 F.2d 955, 956 (9th Cir. 1983) (citing Griggs v. Provident Consumer Disc. Co., 459 U.S. 56 (1982) (per curiam)). But this rule of exclusive appellate jurisdiction is a "creature of judicial prudence . . . and is not absolute. It is designed to avoid the confusion and inefficiency of two courts considering the same issues simultaneously." Id. To avoid piecemeal appeals, "prevent delay and duplication at the appellate level, [and] prevent hasty consideration of postjudgment fee motions," bankruptcy courts "retain the power to award attorney's fees after the notice of appeal has been filed." Id. at 957 (discussing the power of the district court); U.S. ex rel. Shutt v. Cmty. Home & Health Care Servs., Inc., 550 F.3d 764, 766 (9th Cir. 2008); U.S. v. Edwards, 800 F.2d 878, 884 (9th Cir. 1986); J.J.W.C. Enters. v. Pugh (In re Pugh), 72 B.R. 174,

178 (D. Or. 1986).

Accordingly, the bankruptcy court retained the power to order attorney's fees upon Salcido's post-Notice of Appeal motion and did not err by exercising that power.

**2.    The Merits of the Attorney's Fee Award / California Law**

Although the bankruptcy court had the power to order attorney's fees, the thornier question is whether the court applied the correct legal rule.  As a matter of law, was Salcido entitled to attorney's fees?  Under the principle known as the "American Rule," prevailing parties in federal court are not ordinarily entitled to attorney's fees unless authorized by contract or by statute.  Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257 (1975).  The Bankruptcy Code does not provide a general right to recover attorney's fees.  Heritage Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997).

The Supreme Court has addressed the precise issue of whether a prevailing creditor can recover attorney's fees in a Section 523(a)(2) action.  In Cohen v. de la Cruz, 523 U.S. 213 (1998), the Court held that a debt incurred by fraud can include costs and attorney's fees.  "Once it has been established that specific money or property has been obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge."  Id. at 218.

A prevailing creditor's right to attorney's fees is not absolute, however.  We have interpreted Cohen such that "the determinative question for awarding attorney's fees is whether the creditor would be able to recover the fee outside of bankruptcy under state or federal law."  AT & T Universal Card Servs., Corp. v. Hung Tan Pham (In re Hung Tan Pham), 250 B.R.

93, 99 (B.A.P. 9th Cir. 2000). Put more precisely, the question is "whether [the] creditor would be entitled to fees in state court for 'establishing those elements of the claim which the bankruptcy court finds support a conclusion of nondischargeability.'" In re Dinan, 448 B.R. at 785 (quoting Kilborn v. Haun (In re Haun), 396 B.R. 522, 528 (Bankr. D. Idaho 2008)).

Because the basis for attorney's fees can be statutory or contractual, id. at 786, and there is no express statutory basis for attorney's fees, our analysis centers on the attorney's fee provision in the Settlement Agreement as construed under non-bankruptcy law (as there is no such provision in either of the promissory notes). If the scope of the attorney's fee provision is broad enough to encompass a state court action that has the same elements as a Section 523(a)(2)(A) claim — common law fraud — then Salcido is entitled to attorney's fees. Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1083 (9th Cir. 2000) (all five elements of common law fraud under California law must be proven to support nondischargeability determination under § 523(a)(2)(A)).

In relevant part, the attorney's fee provision states,

> [I]t is agreed by the parties that all attorneys' fees and costs incurred as a result of or in connection to the LAWSUIT, mediation, and settlement shall be borne by the parties who incurred such attorneys' fees and costs. Should suit be brought to enforce or interpret any part of this Agreement, the "prevailing party" shall be entitled to recover as an element of costs of suit and not as damages, reasonable attorneys' fees fixed by the Court. The "prevailing party" shall be the party entitled to recover his/her/its costs of suit, regardless of whether such suit proceeds to final judgment.

37

Settlement Agreement (July 8, 2008) at ¶ 19 (emphasis added). Salcido is unquestionably the prevailing party, as we affirm the bankruptcy court's determination of fraud in the procurement of the Settlement Agreement. We focus solely on that fraud because, of the two frauds committed by Sharma, it is the only one that involves the Settlement Agreement and thus the only one that could support attorney's fees under that agreement.

We interpret the Settlement Agreement under California law because the "governing law" provision in the agreement so mandates. Id. ¶ 16. California statute expressly allows parties to contract as they see fit concerning the payment of attorney's fees. "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys is left to the agreement, express or implied, of the parties[.]" Cal. Code Civ. Prov. § 1021 (West 2012). The type of claim — tort, contract, or otherwise — is irrelevant under the statute. Miske v. Bisno, 139 Cal. Rptr. 3d 626, 634, 204 Cal. App. 4th 1249, 1259 (2012); see Redwood Theaters, Inc. v. Davison (In re Davison), 289 B.R. 716, 724 (B.A.P. 9th Cir. 2003). The sole issue is whether the contractual provision itself covers tort claims for fraud. See Miske, 139 Cal. Rptr. 3d at 634.

The California courts have repeatedly interpreted clauses that authorize attorney's fees to "enforce" or "interpret" a contract to not include tort claims for fraud. Exxess Electronixx v. Heger Realty Corp., 75 Cal. Rptr. 2d 376, 383–84, 64 Cal. App. 4th 698, 707–08 (1998); see Xuereb v. Marcus & Millichap, Inc., 5 Cal. Rptr. 2d 154, 157, 3 Cal. App. 4th 1338, 1341–42 (1992). On the other hand, California courts have held

38

that certain broadly-worded clauses do cover fraud claims. Santisas v. Goodin, 951 P.2d 399, 405, 17 Cal. 4th 599, 608 (1998) ("claims arising out of the execution of the agreement or the sale" (internal quotation marks omitted) (emphasis added)); Miske, 204 Cal. Rptr. 3d at 628–29 ("If any dispute arises between the Partners . . . prevailing party shall be entitled to . . . reasonable attorney's fees." (emphasis added)); Lerner v. Ward, 16 Cal. Rptr. 2d 486, 488, 13 Cal. App. 4th 155, 159 (1993) ("in any action or proceeding arising out of this agreement" (internal quotation marks omitted) (emphasis added)); Xuereb, 5 Cal. Rptr. 2d at 160–61 ("attorney fees and costs in any lawsuit or other legal proceeding to which this Agreement gives rise" (internal quotation marks omitted) (emphasis added)).

Xuereb stated that "gives rise" even includes events that occurred prior to contract formation. 5 Cal. Rptr. 2d at 160–61. But even the phrase "any dispute" is not determinative, as a clause limiting fees to "any dispute under this agreement" does not cover fraud claims because "under this agreement" limits the claims to those that arise directly out of the contract and not those that rely on events that occurred before contract formation. See Thompson v. Miller, 4 Cal. Rptr. 3d 905, 911, 112 Cal. App. 4th 327, 334 (2003).

The attorney's fee provision in the Settlement Agreement is limited to actions to "enforce or interpret any part of this agreement." The plain language of the provision is not broad enough to encompass a claim for fraud in the inducement. See Exxess Electronixx, 75 Cal. Rptr. 2d at 383–84; Xuereb, 5 Cal. Rptr. 2d at 157. Under California law, a tort claim does not

39

"enforce" a contract or operate to declare a party's rights under a contract. Exxess Electronixx, 75 Cal. Rptr. 2d at 384.

Moreover, the first quoted sentence of the attorney's fee provision defines a broader category of matters — all those "in connection to the LAWSUIT, mediation, and settlement" — and states that each party shall bear its own fees in connection thereto. The parties apparently contemplated a wide range of actions that could arise from the agreement and the underlying suit and set the American Rule as a baseline. The next sentence demarcates a more limited universe of actions — those that "enforce" or "interpret" the agreement itself — which does not include tort claims for fraud. Id. at 383–84.

Salcido argues that because the state court complaint alleged fraud and the Settlement Agreement was executed to settle the fraud claim (as well as the breach of contract claim), then the attorney's fee provision must contemplate fraud claims. This would be a reasonable, although incorrect, reading of Archer. Archer does not speak to the interpretation or scope of any particular term of a settlement agreement. Rather, it authorizes courts to review settlement agreements to determine if they "reflect[] settlement of a valid claim for fraud." Archer, 538 U.S. at 320. Archer examined the permissible scope of settlement agreements on the whole in light of Congress's intent under Section 523(a) to "ensure that all debts arising out of fraud are excepted from discharge, no matter what their form." Id. at 321 (internal quotation marks and citation omitted). The dischargeability of the underlying fraudulently incurred debt is not dependent on the scope of an attorney's fee provision. Thus,

40

*Archer* should not be read to mean that all attorney's fee provisions, no matter their specific language, contemplate the fraud claims underlying the settlement. In other words, Congress's intent is fully served once a fraudulently incurred debt is excluded from discharge.

It may be correct that Salcido subjectively intended the attorney's fee provision to cover the fraud claim. Contracts, however, are interpreted objectively. See *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 271, 109 Cal. Rptr. 2d 807, 815 (2001). We only look to the facts and circumstances surrounding a contract's formation and apply the rules of interpretation if the meaning is uncertain from the plain language. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 953, 81 Cal. Rptr. 3d 282, 295 (2008) ("Where the language of a contract is clear and not absurd, it will be followed." (internal quotation marks omitted)). Here, the meaning of the attorney's fee provision in the Settlement Agreement is certain. Multiple California cases have interpreted essentially identical clauses and determined that fraud is not an action to "enforce" or "interpret" a contract. As a matter of law then, Salcido was not entitled to attorney's fees. Accordingly, we REVERSE the award of attorney's fees.

**CONCLUSION**

The bankruptcy court applied the correct rule to analyze the nondischargeability of Sharma's debt to Salcido under Section 523(a)(2)(A). It acted within its discretion when it decided that the facts in the Complaint supported the elements of fraud for both instances of fraud — in the inducement of the promissory notes and in the inducement of the Settlement

41

Agreement. The Eitel factors weigh heavily in favor of upholding the Amended Judgment. We thus AFFIRM the bankruptcy court's determination of nondischargeability under Section 523(a)(2)(A) for Sharma's debt to Salcido in the amount of $240,000.

The bankruptcy court erred in determining that attorney's fees were allowable to Salcido, as, under California law, the attorney's fee provision in the Settlement Agreement was not broad enough to include tort actions for fraud. We thus REVERSE the award of attorney's fees to Salcido.